UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
MANDELAY KFT.,                                )
                                              )
        Plaintiff,                            )              Civil Action No.
                                              )
             v.                               )              24 Civ.  ___25-cv-01368__
                                              )
QX WORLD KFT.,                                )              COMPLAINT FOR
WILLIAM C. NELSON                             )              TRADEMARK
a.k.a. DESIRE DUBOUNET, and                   )              INFRINGEMENT AND
WHITE DOVE GLOBAL MARKETING, LTD., )                         UNFAIR COMPETITION
                                              )
        Defendants.                           )              JURY DEMAND
_____       )


As its complaint against Defendants, Plaintiff Mandelay Kft. alleges:


**PARTIES**

    1. Plaintiff, Mandelay Kft.  (hereafter "Mandelay") is a limited liability company

organized and existing under the laws of Hungary, with offices at Gyartelep 12001/33 hrsz.

Szigetszentmiklos, HUNGARY H-2310 and is in the business of selling electronic

biofeedback devices and associated software which use skin electrodes to measure

physiological parameters, enabling a biofeedback practitioner and/or patients to monitor and

use the physiological parameters and/or software processed products thereof as informational

feedback to control physiological reactions affecting patient health. Plaintiff, Mandelay and

its predecessor, Maitreya, Kft., have used the trademarks and designations of origin

QXsubspace.com, SCIO and EDUCTOR (the "Trademarks") in the sale of Mandelay's

biofeedback devices and associated products since long before the infringement complained of herein.

2.      Defendant, QX World Kft ("QXW"), is a limited liability company organized and existing under the laws of Hungary, and not a resident of the United States, having offices at Tinodi 1-3, A. building, IV.floor, 93, Budapest, HUNGARY 1095. QXW has been engaged in selling electronic biofeedback devices and related products and services under the infringing alleged trademarks and misrepresentations of origin, namely Mandelay's Trademarks QXsubspace.com, SCIO and EDUCTOR, and other confusingly similar designations (including, without limitation, QX, QUEX, QUEX S, QUEX IO, QUEX ED, QXsubspace.com and QXworld.eu (the "Other Infringing Designations")). Defendant QXW has infringed upon the trademark rights of Mandelay by initiating and expanding its sales in Europe and the United States and by filing trademark applications in Europe and the United States.

3.      Defendant, White Dove Global Marketing, Ltd. ("White Dove") is a resident of the State of Michigan and, upon information and belief, is a Michigan corporation with its principal place of business at 2655 Oakley Park Rd Suite 104, Commerce Charter Twp., West Bloomfield, Michigan 48390, and has been engaged in selling electronic biofeedback devices and related products and services under one or more of the infringing alleged trademarks and misrepresentations of origin SCIO and EDUCTOR, and one or more of the Other Infringing Designations (including, without limitation, QX, QUEX, QUEX S, QUEX

IO, QUEX ED and QX. Upon information and belief, White Dove is Defendant QXW's exclusive distributor in the United States for the products sold under the Trademarks and Other Infringing Designations and, upon information and belief, is aware of the rights of Mandelay, asserted herein.

4. Defendant William C. Nelson, a.k.a. Desire Dubounet ("Nelson-Dubounet"), is a resident of the State of New Mexico and does business as "Nelson Quantum Biofeedback," and has been, and/or is now, engaged in selling electronic biofeedback devices and related products and services, in cooperation with Defendant QXW, under the infringing alleged trademarks and misrepresentations of origin QXsubspace.com, SCIO and EDUCTOR, and confusingly similar designations (including, without limitation, QUEX, QUEX S, QUEX IO, and QUEX ED; and Defendant Nelson-Dubounet has received, and, upon information and belief, continues to receive compensation and/or claims to be owed compensation from Defendant QXW on account of said sales in cooperation with Defendant QXW.

## JURISDICTION

5.    This Court has jurisdiction over this action by virtue of:

(a)  Jurisdiction founded on the existence of a federal question arising under the Lanham Trademark Act.  The Court has jurisdiction under Sections 43(a) of the Trademark Act of 1946, 15 U.S.C. 1121 and 1125(a), and the Judicial Code, 28 U.S.C. 1331 on account of the existence of a question arising under the Constitution, laws or treaties of the United States, and 28 U.S.C. 1338(a) in that this case arises under the trademark laws of the United

States, 15 U.S.C. 1051 et seq., as hereinafter more fully appears, and 28 U.S.C. 1332(a), as

this action arises between a foreign national, and residents of the states of Michigan and New

Mexico and a foreign national; and because the matter in controversy exceeds the sum or

value of $75,000.

(b)    Jurisdiction over related common law claims of unfair competition.  The Court

has jurisdiction of the common law unfair competition claims herein under the provisions of

28 U.S.C. 1338(b) in that said claims are joined with a substantial and related claim under

the trademark laws of the United States, 15 U.S.C. 1051 et seq.

(c)  Venue is proper under 28 U.S.C. 1391.


### BACKGROUND FACTS APPLICABLE TO ALL COUNTS

6. The first user of the SCIO trademark was Maitreya Kft. ("Maitreya"), a

Hungarian company and Plaintiff Mandelay's immediate predecessor in interest.

Maitreya began using the SCIO Trademark on biofeedback devices on or about

February 1, 2003. The first user of the EDUCTOR trademark was Plaintiff

Mandelay. Mandelay  began using the EDUCTOR Trademark on biofeedback

devices on or about January 1, 2013. Such uses, now through Plaintiff as

Maitreya's assignee, have continued to the present and have been continuous since

the above dates of first use. Products include such capabilities as

electroencephalography, electrocardiography, galvanic skin response, and

microcurrent Transcutaneous Electro Nerval Stimulation (MENS) for pain reduction.

7. Maitreya, which was making sales of biofeedback devices (and other products and services), experienced serious financial difficulties in or about 2010-2011, causing its then majority shareholder and CEO, Defendant William Charles Nelson, a.k.a. "William C. Nelson, Jr.," "Will Nelson," and Desire Dubounet ("Nelson-Dubounet"), to sell Nelson-Dubounet's entire majority share in Maitreya to Zoltan Nagy.

8. Zoltan Nagy reorganized the business of Maitreya, transferring the biofeedback production and sales part of the business (including the SCIO Trademark, device production contracts and device software rights) to Plaintiff Mandelay. Exhibits 1-2.

9. For about two years after the stock sale by Nelson-Dubounet, Defendant(s) carried on the business as the sole supplier in the world of SCIO (and, later, the EDUCTOR) biofeedback devices and related products and services through Mandelay's website which existed under the Trademark as an address on the Internet at QXsubspace.com.

A. New Nelson-Dubounet Competitive Company and Theft of Stofware

10. On or about May 14, 2012 (*after* Defendant Nelson-Dubounet's sell-out of his interest in Maitreya to Nagy in 2010-11 and after the subsequent transfer of

the SCIO business to Mandelay pursuant to the above reorganization), three former

employees of Maitreya Kft. set up their own company, Defendant QX World Kft.

("QXW") (using the QX portion of the Mandelay's website address

QXsubspace.com) and worked for Mandelay selling Mandelay's SCIO products,

which at that time were manufactured by Mandelay's contract manufacturer,

Pentavox Kft. under the assigned production contract.

    B. Unauthorized Use of Website Credentials

    11. Upon information and belief, in or about 2013-2014, Defendant Nelson-

Dubounet, unhappy with having been forced (by Nelson-Dubounet's own financial

failures) to have divested his interest in Maitreya, attempted to take over the

business which Mandelay had purchased in the reorganization. In apparent

collusion with Nelson-Dubounet, Defendant QXW surreptitiously took physical

control of Mandelay's website at QXsubspace.com, 1) over which sales were

made, and which 2) controlled access to Mandelay's software (the same software

which Plaintiff Mandelay  had long before purchased from Maitreya) for operating

Mandelay's biofeedback devices.

    12. More particularly, Defendant to QXW took such control by using

website credentials which were unchanged from the time that Defendant Nelson-

Dubounet operated the business. Defendant QXW's current CEO, Zsolt "Geri"

Gernstenbrein, a former employee of Maitreya, was the person who physically

took over control of Plaintiff Mandelay's website by using the credentials without authorization of Mandelay.

### C. Software Held Hostage

13. As a result of the illegal physical takeover of Mandelay's website by Gernstenbrein, Defendants Nelson-Dubounet and/or QXW controlled and/or had control over and exclusive access to Mandelay's software. This meant that Plaintiff Mandelay was no longer able to provide the needed software to customers purchasing its biofeedback devices. Thus, Mandelay was prevented from fulfilling orders from its customers.

### D. 2014 Payment Demands

14. Next, Defendant QXW, in apparent collusion with Nelson-Dubounet, demanded payment from Mandelay in exchange for releasing the software to Mandelay customers. Defendants QXW, in further apparent collusion with Nelson-Dubounet then coerced Mandelay into signing an alleged agreement document with provisions allegedly requiring Mandelay to pay Defendant(s) in order to allow Mandelay's customers to download Mandelay's own software on the hijacked website.

15. In further attempts to take control of the business interests previously sold by Defendant Nelson-Dubounet, Defendant QXW filed numerous trademark applications, directly and indirectly, in Europe attempting to assert rights over

several of the Trademarks. Mandelay has prevailed in numerous contested actions in Europe respecting such trademark applications.

16. The object of Defendants' exercising of such control over the software and illegal attempt to assert trademark rights in Europe (as well as in the United States), to coerce Mandelay in an attempt to get it to tolerate competition by Defendants QXW and White Dove under the infringing Trademarks and Other Infringing Designations. As a consequence of such coercion, Mandelay engaged in extensive litigation in Europe to regain control of Mandelay 's Trademarks.

17. Defendants have proffered an alleged 2014 "contract" (Exhibit 8) document supposedly related to payments which have been extracted from Plaintiff. While Mandelay contested the existence and/or enforceability of the alleged 2014 "contract," Mandelay paid the demanded fees in order to prevent the shutdown of its business.

E. Applicant Acknowledged Mandelay's Trademark Ownership

18. Notwithstanding the assertion of rights by Defendant QXW, the alleged 2014 contract document, tendered by Defendants Nelson-Dubounet and QXW, which was *signed by Nelson-Dubounet*, included *an acknowledgment that the SCIO trademark was the property of Mandelay*.

F. 2017 Trademark Filing

19. Next, not satisfied with collection of the fee to which it was not entitled and notwithstanding the prior acknowledgment of trademark rights in the alleged 2014 document, Defendant QXW filed United States trademark application No. 87644373 on October 13, 2017, in a further brazen attempt to deny Mandelay of its right to the SCIO trademark. It is worth remembering that this right was transferred to it by Maitreya after Nelson-Dubounet got Maitreya into financial trouble and was forced to sell the ownership of the company in 2011[1]. Such application constituted a fraud upon the United States Patent and Trademark Office, as appears more fully below.

## DEFENDANTS' CONTENTIONS

A. 2017 Document Forged by Nelson-Dubounet and Alleged Oral Agreement

20. Nelson-Dubounet and Defendant QXW attempt to justify the subject filing of the trademark SCIO arguing, in a related proceeding before the United States Patent and Trademark Office, that Maitreya's use of the SCIO trademark between 2003 and the sale of the company by Nelson-Dubounet in 2011, inured to the benefit of Defendant Nelson-Dubounet, personally, contending that the trademark was owned personally by Defendant Nelson-Dubounet and that there

---

[1] Mandelay filed an application on its SCIO trademark on Oct. 13, 2017, but this application was inadvertently abandoned due to miscommunication with counsel.

was allegedly an oral license agreement between Defendant Nelson-Dubounet and Maitreya licensing use of the trademark SCIO to Maitreya.

21. Defendants further contend that the "oral license" had a provision that the license applied only while Nelson-Dubounet was the majority shareholder of Maitreya, and that the license was automatically terminated when Nagy purchased the Maitreya shares from Nelson-Dubounet.

22. Defendants QXW and Nelson-Dubounet have also, in the related United States Patent and Trademark Office ("USPTO") proceeding, proffered a forged 2017 agreement document (Exhibit 9) in what appears to be an attempt at supporting a claim by QXW and/or Nelson-Dubounet to one or more of the Trademarks, as appears more fully below. Upon information and belief, Defendants QXW and Nelson-Dubounet continue to cooperate with each other in the infringement of the trademark rights of Plaintiff.

II.    FACTS

A. Nelson-Dubounet Sold Maitreya When He Was Focused on the Film Business

23. As noted above, Maitreya was in the business of selling alternative medicine biofeedback devices under the Trademarks. In the early 2000's, Maitreya, under the management of its principal stockholder and then CEO, Defendant Nelson-Dubounet, lost large sums of money while Defendant Nelson-

Dubounet was, apparently, focused on producing about ten films with Defendant Nelson-Dubounet as the star, playing herself under the *persona* Desire Dubounet. Exhibit 3.

### B. Software Assigned to Mandelay in 2011

23. With Maitreya unable to recover from the financial losses, Defendant Nelson-Dubounet, as noted above, decided in 2011 to sell all Nelson-Dubounet's shares in Maitreya to Zoltan Nagy, who then became majority owner of Maitreya. Following a change in management in 2011, Maitreya assigned the rights to the SCIO business and trademark (and its associated software) to Plaintiff Mandelay in December 2011. Exhibits 1-2, notarized testimony of two signatories to the agreement, Zoltan Nagy and Kornel Tokics. This resulted in transfer of rights in the SCIO trademark and all rights in the software to Mandelay.

### C. Alleged Oral Agreement

24. However, as alluded to above, Defendants QXW Nelson-Dubounet, in their response to Mandelay's Interrogatory 2, in the related USPTO proceeding contend that the 2011 transfer of trademark rights to Mandelay was ineffective. Remarkably, Defendant(s) points to and relies upon the alleged ***oral*** license agreement, presumably granted prior to the 2011 transfer of the trademark to Mandelay, under which Maitreya was supposedly granted a license to use the

11

trademark by Defendant Nelson-Dubounet. Defendant QXW's Response to Mandelay's Interrogatories, Exhibit 4.

D. Alleged Contingency

25. Defendant(s) further contends that the oral license, supposedly in place sometime before 2011, was contingent on Nelson-Dubounet's remaining a majority stockholder of Maitreya. Defendant QXW's Response to Mandelay's Interrogatories, Exhibit 4.

26. On this basis, Defendant Nelson-Dubounet contends that the subsequent sale of assets from Maitreya to Mandelay did not transfer the SCIO trademark, because, as Defendant(s) puts it, "[a]ll rights acquired through [Maitreya's] sales… inure[d] to the benefit of [Nelson-Dubounet] because such products were sold under a license from [Nelson-Dubounet]," and that Defendant Nelson-Dubounet's above divestiture of stock canceled the license. Exhibit 4, Defendant QXW's Response 2.

27. By its nature the alleged oral agreement depends upon the credibility of Nelson-Dubounet. However, Defendant Nelson-Dubounet has a highly dubious record for veracity and honesty.

E. FDA Felony Investigation, Prosecution and Flight from the United States

28. More particularly, in the face of an FDA recommendation of criminal prosecution against Nelson-Dubounet, an American citizen, for "felony" level

activities in the District of Colorado (on account of "several fraudulent FDA letters [purporting to come from the FDA]…; and other fraudulent" activities) fled the United States, taking asylum in Hungary for almost 30 years. Nelson-Dubounet's illegal activities included FDA violations, writing "fraudulent FDA warning letters to a manufacturer and users of a competitor device," and then "attempt[ing] to divert the FDA investigation by mailing another fraudulent letter." Exhibit 5, letter of FDA Special Agent Hudson, on prime target William C. Nelson, Jr. dated February 10, 1994.

F. Three Injunctions for Practicing Medicine without a License

29. In addition, Nelson-Dubounet also has been subjected to three injunctions for practicing medicine and chiropractic medicine without a license in the states of Colorado and Minnesota. Exhibit 5. Apparently, Nelson-Dubounet was prosecuted as recommended by Special Agent Hudson, and evaded prosecution by becoming a fugitive for most of Nelson-Dubounet's adult life. Nelson-Dubounet only recently returned to the United States and now resides in Albuquerque New Mexico. Exhibit 6.

G. Continued Misrepresentation by Nelson-Dubounet of Being a Medical Doctor

30. Moreover, Defendant Nelson-Dubounet has not mended his ways, ***still*** self-styling as "Prof of Medicine Desire Dubounet MD" on a YouTube channel. Exhibit 7.

H. Conspiracy to Coerce

31. As alluded to above, while Defendant QXW, in collusion with Defendant Nelson-Dubounet, was holding the Mandelay software hostage, Defendant Nelson-Dubounet presented Kornel Tokics, managing director of Mandelay , with an "agreement" document providing for the ransom payment demanded by the conspirators. Exhibit 8. More particularly, the presentation of this document to Mandelay in 2014 constituted an admission.

I. Admission of Trademark Ownership in Mandelay by Applicant

32. Directly contrary to Defendant(s)/Nelson-Dubounet's allegations in the USPTO proceeding, the "agreement" document provided that "***Mandelay kft [is the]… owner of [the] trademarks for Eductor and SCIO***" Exhibit 8, ¶ 4. As alluded to above, this alleged "agreement" imposes fees on Mandelay for sales of the SCIO product (manufactured by a third party) and associated SCIO software (allegedly payable to Defendant Nelson-Dubounet's supposed company QX World (Bahamas), even though Defendant Nelson-Dubounet sold out Nelson-Dubounet's interest years before in 2011). Upon information and belief, for many years and until relatively recently, Nelson-Dubounet received a share of payments made by Mandelay to Defendant(s), through the supposed Bahamas entity which had long before ceased to exist.

J. 2017 Filing Does Not Disclose Mandelay Use of 2014 Contract

33. As alluded to above, notwithstanding the earlier acknowledgment of trademark ownership in Mandelay in 2014, Defendant(s) Defendant QXW filed United States trademark application No. 87644373 on October 13, 2017. In that application, Defendant QXW's "owner," stated that "[t]o the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."

34. Despite the totally independent use by Mandelay, admitted by Defendant QXW as noted above, Defendant QXW violated its duty of disclosure by not indicating the concurrent use by Mandelay  in the fraudulent application for trademark registration.

35. Accordingly, the application, executed by Andrea Kurucz-Taflan, constituted a fraud perpetrated by Defendant QXW upon the USPTO.  The effect and intent was to create a situation where the USPTO would take action based on an incomplete picture and issue a registration to Defendant QXW.

K. Newly Produced 2017 Forgery: Nelson-Dubounet "lawyer" for IP Owner

36. Moreover, in the course of the parties' disputes in the United States and in Europe, as noted above, Defendant Nelson-Dubounet has produced another alleged contract, allegedly executed on or about March 31, 2017, in which

Defendant Nelson-Dubounet self-styles, this time, as "Desire' Dubounet international lawyer… and now the legal consultant for the agency holding the intellectual property." Exhibit 9.  This document appears to have been drafted by an amateur[2], and Defendants are apparently arguing that it places trademark rights under control of Defendant Nelson-Dubounet and/or allegedly confirms Defendant Nelson-Dubounet's alleged ownership, for example providing that the "Intellectual Property [an undefined term] has been assigned to QX Ltd directed by [Defendant Nelson-Dubounet as] Consultant." Bracketed material added. Exhibit 9. However, the purported signature of Kornel Tokics to this document is clearly a forgery as can be seen by comparison to his signature in the alleged December 2014 "agreement" document. Exhibit 8, page 2.

37. Defendant Nelson-Dubounet also claims to have assigned his alleged rights to the SCIO trademark to Defendant(s) in 2017. Exhibit 4, Defendant QXW's response to Interrogatory 2.

L. Indictment in Hungary

38. As shown by the warrant and translation of Exhibits 12-13, Defendant Nelson-Dubounet is the subject of a Hungarian indictment/warrant for forgery,

---

[2] Indeed, one signatory is a Bahama-based company which did not exist at the date of the agreement, having been struck off the register in 2011. Moreover, the competent *Hungarian court found the Exhibit 9 alleged agreement to be invalid because of its contradictory statements*. Exhibit 10-11, Hungarian decision and translation.

which is believed to have triggered his return to the United States despite his decades-long fugitive status.

39. In addition to the above fraudulent filing of the SCIO trademark, Defendant QXW has made fraudulent filings of applications for trademark registration in the United States Patent and Trademark Office for the alleged trademarks EDUCTOR (Application Number 87977360), and for the Other Infringing Designations QUEX ((Application Number 87694428), QUEX S (Application Number 87694430), QUEX IO (Application Number 87694436), and QUEX ED (Application Number 8769443), together with the trademark SCIO, the "Infringing Designations".

40. In the trademark applications directed to SCIO (Application Number 87644373), EDUCTOR (Application Number 87977360), QUEX ((Application Number 87694428), QUEX S (Application Number 87694430), QUEX IO (Application Number 87694436), and QUEX ED (Application Number 87694434) (collectively the "Fraudulent Applications"), Defendant(s) falsely alleges in the Fraudulent Applications for trademark registration to be Defendant(s)'s mark, then, ignoring the rights of Mandelay, alleges fraudulently that no other person has the right to use those marks or confusingly similar terms as trademarks.

41. Defendant(s) sells the same products, namely biofeedback devices and related products, through the same and/or substantially the same channels of trade to the same class of customers through which and to which Plaintiff sells its products under the Trademarks.

42. Moreover, end-user consumers of Defendants' and Plaintiff's products are the same class of consumers.

43. Defendants, by thus infringing upon the trademark rights of Plaintiff, sought to misappropriate the benefit of the time, effort, and resources expended by Plaintiff in developing Plaintiff's business. Moreover, such actions have been willful and with knowledge of Plaintiff's prior rights, on account of earlier applications for registration filed by Plaintiff, Defendant Nelson-Dubounet's divestiture of stock in Plaintiff's predecessor in interest and, upon information and belief, communication of Plaintiff's rights by Defendant Nelson-Dubounet to Defendant QXW.

44. By infringing upon the trademark rights of Plaintiff, Defendant(s) thus passed off Defendant(s)'s goods as those of Plaintiff.

45. Plaintiff has publicized its business and the Trademarks, and has invested considerable time and money in establishing its business. Plaintiff and its predecessors have long engaged in the production of biofeedback devices and related products and the provision of services under the Trademarks.

46. Plaintiff and its predecessors have been using, and continue to use, the Trademarks, including, without limitation, the trademarks SCIO, EDUCTOR, QX, and QXsubspace.com in interstate commerce in connection with the above-identified goods and related products and services, and have done so continuously since 2003, and have achieved a significant marketplace presence.

47. Defendants' activities complained of herein constitute use of the same and/or similar products that are substantially functionally identical from the viewpoint of the consumer, or the same type as the goods and services of Plaintiff, which are sold or have been so under the

trademarks SCIO and the other Trademarks, and is likely to cause confusion in the marketplace.

48. Defendants' infringement of the Trademarks is the use of marks substantially identical to or confusingly similar to Plaintiff's Trademarks (including, without limitation, the Trademarks and the Other Infringing Designations), and Defendants' use is thus confusingly similar in sight, sound, and meaning and likely to cause confusion. The use and/or registration of Plaintiff's trademarks SCIO and EDUCTOR, as well as the other Trademarks and the Other Infringing Designations by Defendants is likely to and will result in confusion, mistake and/or deception as to the source or origin of Defendants' goods, leading customers to believe, incorrectly, that Defendant(s) is somehow affiliated with, has been approved by, is sponsored by, or is still selling product manufactured by Plaintiff. The likelihood of confusion is enhanced by Defendants' prior use of counterfeit designations which are identical to the Trademarks.

50. If Defendant(s) is permitted to use and/or register Defendant(s)'s alleged mark for the products identified in the Application, confusion in trade, resulting in irreparable damage and injury to Plaintiff, is likely to, and indeed inevitably will, result by reason of the similarity between the marks used by Defendants on Defendants' products and Plaintiff's use, and the goods offered and provided by Plaintiff thereunder. Any defect, objection, or fault found with goods marketed by Defendant(s) under the Defendant(s)'s pseudo-trademarks/counterfeit designations, namely the infringing misdesignations of origin

complained of, would reflect on, and injure, the reputation for superior quality which Plaintiff has for goods provided under Plaintiff's Trademarks.

51. If Defendant QXW's applications and registrations complained of herein are allowed to stand, Defendant(s) might argue a prima facie exclusive right to use the mark set forth in the Application. Such registration would become a source of damage and injury to Plaintiff through the generation of confusion, mistake, and/or deception, the dilution of Plaintiff's use of Plaintiff's Trademarks and the diminution of Plaintiff's ability to control the quality of goods sold and provided thereunder.

52. Moreover, Defendants' use of the Other Infringing Designations runs contrary to the requirement that all doubts as to the likelihood of confusion be resolved in favor of Plaintiff, and against Defendants, who have a legal duty to select a mark dissimilar to marks already in use, to act in good faith, and to not engage in deceptive actions. Such duty is violated by a) the similarity in sight, sound, and meaning, between the Defendant(s)'s pseudo-trademark Other Infringing Designations and the infringement by Defendants of Plaintiff's Trademarks, and b) the similarity between the goods sold under Defendants, as complained of above, and those sold by Plaintiff in connection with Plaintiff's Trademarks, and there is likelihood to cause confusion, and/or cause mistake, and/or to deceive.

Fruit of the Poisonous Tree

53. Defendants have unfairly misappropriated Plaintiff's business and goodwill through the use of the Trademarks and the Other Infringing Designations. Defendants have diverted and continue to divert business from Plaintiff to Defendants by infringing the Trademarks

and using the Other Infringing Designations, including, without limitation, using Mandelay's trademark and Internet address, QXsubspace.com as a gateway to forward Internet traffic to Defendants' website which exists at the infringing Internet address QXworld.eu. The business and goodwill associated with the business operated by Defendant QXW from the Internet address QXworld.eu is the product of the misappropriation of Plaintiff's business (including, without limitation, the product of the above complained of infringing activities) and is, in whole or in part the business and goodwill of Plaintiff Mandelay. Moreover, recognizing the valid nature of Mandelay's claims herein, Defendants have explicitly abandoned at least some of the Trademarks, including, at least, Mandelay's SCIO and EDUCTOR trademarks, insofar as Defendant QXW has indicated explicitly discontinuance of use on the website it operates at QXworld.eu, which states "EDUCTOR (discontinued)" and "SCIO (discontinued)". Exhibit 16, page 5/5. The complained of diversion of business has tainted Defendant's current business under its alleged trademarks SCIO and EDUCTOR, and the goodwill associated with its current business, as the fruit of the poisonous tree, is the goodwill of Plaintiff, and all use of trademarks other than the Trademarks should be enjoined by this Court.

## COUNT ONE
## UNFAIR COMPETITION-OTHER INFRINGING DESIGNATIONS

54.    As a cause of action and ground for relief, Plaintiff alleges and incorporates by reference paragraphs 1 through 53 of this complaint as a part of this Count.

55.     Defendants misappropriated Plaintiff's goodwill associated with the Trademarks by using the Other Infringing Designations and creating confusion thereby to Defendants' own competitive advantage.

56.     Defendants' above-complained of activities constitute misappropriating the goodwill associated with Mandelay 's longstanding use of the Trademarks, under which Plaintiff has earned a respected position with the biofeedback device and related products consumer community.

57.     Defendants have blatantly and brazenly misappropriated Plaintiff's Trademarks by using the Other Infringing Designations for Defendants' own commercial advantage. Defendants used and continue to use Plaintiff's property, and continue to benefit from such use.

58.     Such infringing use of the Trademarks and the Other Infringing Designations by Defendants has and continues to irreparably injure Plaintiff.

59.     Plaintiff has suffered damage and Defendants have been unjustly enriched in amounts at present uncertain, but believed to be in excess of $5,000,000 on account of said complained of acts of Defendants.  Plaintiff is entitled to judgment for monies diverted from Mandelay  to Defendants and any damages and lost profits sustained by Plaintiff in consequence of the deliberate nature of the unfair competition and infringement by Defendants in an amount equaling three times said damages.

60.     By reason of the acts of Defendants herein alleged, Plaintiff has been damaged and, unless restrained, Defendants will continue to deceive the public, impair the value of Plaintiff's Trademarks and otherwise will cause Plaintiff immediate and irreparable harm.

Plaintiff is entitled to an injunction enjoining Defendants from using Plaintiff's Trademarks and the Other Infringing Designations.

## COUNT TWO
## INFRINGEMENT OF COMMON-LAW TRADEMARK RIGHTS

61.     As a cause of action and ground for relief, Plaintiff alleges and incorporates by reference paragraphs 1 through 60 of this complaint as a part of this Count.

62.     Plaintiff's products and services provided under the Trademarks have been rendered in great numbers and continue to be extensively furnished and performed by Plaintiff throughout the United States.

63.     Plaintiff derives substantial benefits from the Trademarks.

64.     Defendants' use of the Trademarks and other acts are a false description and representation that Defendants' goods and services are furnished by, sponsored by and/or affiliated with Plaintiff.  Said acts constitute common law trademark infringement, passing off and free-riding, and are in violation of the unfair competition and trademark law of the several states in that Defendants have used, in connection with goods and/or services, a false designation of origin and a false description and representation, including words likely to confuse the public.

65.     By such actions Defendants have damaged Mandelay.

## COUNT THREE
## FEDERAL UNFAIR COMPETITION -- LANHAM ACT SECTION 43

66.     As a cause of action and ground for relief, Plaintiff alleges and incorporates by reference paragraphs 1 through 65 of this complaint as a part of this Count.

67.     Plaintiff, prior to the acts complained of herein, has been and is now engaged in interstate commerce and/or the foreign commerce of the United States by virtue of the ongoing provision of goods and services under the Trademarks.  By virtue of the foregoing activities of Plaintiff, the Trademarks have become associated with Plaintiff and indicate the origin of goods coming from Plaintiff.

68.     The aforesaid acts of Defendants constitute unfair competition and passing off, and are likely to cause the trade and the public to erroneously believe that Defendants' products and services originate with and/or are guaranteed by Plaintiff, or otherwise associated with Plaintiff.  Said acts are in violation of 15 U.S.C. 1125(a) in that Defendants have used, in connection with goods and services, a false designation of origin and a false description and representation, including words, reproductions and other symbols tending falsely to describe or represent the same and have caused such services to enter into interstate commerce.

69.      Such acts have injured and continue to injure Plaintiff's business reputation and dilute or otherwise injure or destroy the distinctive character of Plaintiff's Trademarks and the quality of Plaintiff's reputation associated with its Trademarks, all to Plaintiff's substantial and irreparable harm.

70.     As a result of Defendants' willful, fraudulent and malicious acts, Plaintiff has suffered damage and Defendants have been unjustly enriched.  Plaintiff is entitled to judgment for Defendants' profits and Plaintiff's losses made on account of the infringement of the rights of

Plaintiff and any other damages sustained by Plaintiff in consequence of the deliberate nature of the infringement by Defendants in an amount equaling three times said damages.

71.    By reason of the acts of Defendants alleged herein, Plaintiff has been damaged and, unless restrained, Defendants have and will continue to confuse and deceive the public, impair the value of Plaintiff's Trademarks and otherwise cause Plaintiff immediate and irreparable harm.

72.    Defendants are liable to Plaintiff for violation of 15 U.S.C. 1125(a).

## COUNT FOUR
## N.Y. COMMON LAW UNFAIR COMPETITION

73. As a cause of action and ground for relief, Plaintiff alleges and incorporates by reference paragraphs 1 through 72 of this complaint as a part of this Count.

74. Defendants have previously and are presently unfairly competing with and infringing intellectual property rights of Plaintiff as complained of above and, *inter alia*, making, using, selling, exporting to and/or importing into the United States products and services calculated to send a false message to consumers that Defendants' products and services are licensed by Plaintiff that Defendants' products and services emanate from Plaintiff. Such actions have been taken by Defendant for the explicit purpose of creating confusion in the marketplace, unfairly taking sales away from Plaintiff, unfairly generating profits for Defendants, and trading upon the reputation of Plaintiff.

75.  Defendant's infringement upon the rights of Plaintiff, as detailed above, has resulted in confusion insofar as consumers have been deceived or are likely to be deceived into

believing that Defendant's products and services are made, sponsored, approved or otherwise endorsed by Plaintiff.

76.  The above complained of activities of Defendant constitute, unfair competition, passing off, free-riding on the reputation of Plaintiff's products and services, and Defendants have and continue to seek to reap where Defendants have not sown, create and profit from consumer confusion with respect to the origin of Defendants' goods, unfairly compete and commit unfair trade practices in violation of the common law of the State of New York, and Plaintiff has been damaged on account of the same.

**COUNT FIVE**
**<u>PRIMA FACIE TORT</u>**

77. As a cause of action and ground for relief, Plaintiff alleges and incorporates by reference paragraphs 1 through 76 of this complaint as a part of this Count.

78. In addition, Defendant Dubounet-Nelson is interfering with the business of Plaintiff, including by providing to Defendant QXW documentation "expressly authoriz[ing]" Defendant QXw to pursue what have proven to be meritless trademark lawsuits against Mandelay and Mandelay's CEO Kornel Tokics. Such interference has been effected by a fraudulent authorization agreement (the "Fraudulent Authorization"), annexed hereto as Exhibit 20.

79. Defendant Nelson-Dubounet, upon information and belief, and Defendant QXW are, further, currently cooperating in the making of sales infringing the trademark rights of

Plaintiff, including soliciting business and making sales using the trademarks, for example on the website of Defendant QXW. Exhibit 21.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

(a) This Court grant and enter a judgment that Mandelay is the owner of all rights in the Trademarks as applied to biofeedback products, and related products and services, and that said rights of Plaintiff have been infringed by Defendants and that Defendants and all persons acting in concert with them be preliminarily and finally enjoined from using the Trademarks EDUCTOR, QUEX, QUEX S, QUEX IO, and QUEX ED, and any and all other infringing designations; and otherwise infringing upon the Trademarks and goodwill of Plaintiff.

(b) Defendants be required to account to Plaintiff for any and all profits and funds collected or otherwise derived by Defendants from their activities, as well as all damages sustained by Mandelay by reason of Defendants' use of the Trademarks and Other Infringing Designation and unfair competition herein alleged.

(c) A preliminary and final order enjoining Defendants from i) use of the Trademarks, including, without limitation, QXsubspace.com, SCIO and EDUCTOR, and confusingly similar designations and terms derived therefrom or confusingly similar thereto, ii) use of the Other Infringing Designation in any and all forms thereof, and terms and designs derived

therefrom or confusingly similar thereto, and iii) mimicking Plaintiff's Trademark in their advertisements, website and otherwise.

(d) A preliminary and final order requiring that all documents, electronic documents, websites, materials, labels, signs, products, packages, wrappings, receptacles, advertisements, and other business and promotional materials in Defendants' possession or control bearing the Trademarks or the Other Infringing Designation or any reproduction, counterfeit, or copy of the Trademarks (including all literature, server copies, uploaded copies, video recordings, audio recordings, publications, contracts, information and other materials embodying the infringing activity forming the subject matter of this complaint), and all plates, molds, matrices, electronic files and other means of making the same shall be delivered up and destroyed.

(e) An order that all Internet traffic to websites bearing the Trademarks or any Other Infringing Designation, including, without limitation, the websites QXworld.eu and QXsubspace.com be directed to a portal page to be designated by Plaintiff.

(f) An order that the Defendants transfer and assign any domain name bearing any Trademark or Other Infringing Designation, and any other similar or confusingly similar domain names to Mandelay.

(g) An order that all of Defendant's U.S. trademark registrations and applications of the Trademarks and Other Infringing Designations and of confusingly similar and or otherwise infringing marks are null and void, and that the same are cancelled.

(h) Plaintiff be awarded actual damages and punitive damages, and that such damages be trebled, and that costs of this action be assessed against Defendants.

(i)  That the alleged 2014 contract be declared null and void and of no legal effect.

(j)  That the alleged 2017 contract be declared null and void and of no legal effect.

(k) That all monies extracted from Plaintiff under the pretext of the alleged 2014 and/or alleged 2017 contracts be returned to Plaintiff by Defendants.

(l) That this Court find that to the extent Defendants ever had any rights to the trademarks SCIO and EDUCTOR that any such rights have been lost on account of abandonment of use of the trademarks SCIO and EDUCTOR.

(m) That Plaintiff have such other and further relief as is just, including costs and attorney's fees.

Dated: February 17, 2025

By:    /s/Anthony H. Handal
       Anthony H. Handal
       Handal & Morofsky LLC
       Attorneys for Plaintiff
       Mandelay Kft.
       83 East Avenue
       Norwalk, CT 06851
       917 880 0811
       handal@HandalGlobal.com

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff Mandelay Kft. hereby demands a jury

trial of any and all issues in this action so triable.

Dated: February 17, 2025

                                                Respectfully submitted,
                                                /s/ Anthony H. Handal
                                                Anthony H. Handal
                                                Handal & Morofsky, LLC
                                                83 East Avenue, Suite 308
                                                Norwalk, CT 06851
                                                Tel: 917-880-0811
                                                Email: handal@handalglobal.com
                                                Attorneys for Plaintiff
                                                MANDELAY KFT

DATED: February 17, 2025