UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MANDELAY KFT.,

Plaintiff,

*-against-*

QX WORLD KFT., WILLIAM C. NELSON, *also known as* DESIRÉ DUBOUNET, *and* WHITE DOVE GLOBAL MARKETING LTD.,

Defendants.

**OPINION & ORDER**

25-cv-1368 (ER)

RAMOS, D.J.:

Mandelay Kft. ("Mandelay") brings state and federal trademark claims against QX World Kft. ("QX World"), William C. Nelson, also known as Desiré Dubounet, and White Dove Global Marketing Ltd. ("White Dove").[1] Doc. 1. Before the Court is QX World and White Dove's motion to dismiss all claims. Doc. 72. For the reasons stated below, the motion is GRANTED.

## I. BACKGROUND

### A. Factual Background

Mandelay is a Hungarian limited liability company that sells electronic biofeedback devices and associated software. Doc. 1. ¶ 1. Mandelay and its predecessor, Maitreya, Kft. ("Maitreya") have trademarks and designations of origin in "QXsubspace.com," "SCIO," and "EDUCTOR" (the "Trademarks"), in conjunction with sales of electronic biofeedback devices. *Id.*

[1] A suggestion of death was filed as to Dubounet on January 12, 2026, and after the requisite Fed. R. Civ. P. 25(a)(1) period passed, the Court dismissed all claims against Dubounet and claims brought by Dubounet. *See* Doc. 111.

QX World is a Hungarian limited liability corporation that also sells electronic biofeedback devices and related products. *Id.* ¶ 2. White Dove is a Michigan Corporation that serves as QX World's exclusive distributor in the United States. *Id.* ¶ 3. QX World paid Dubounet, former chief executive officer ("CEO") of Maitreya and resident of New Mexico at all times relevant to the complaint, to help engage in the sale of these devices. *Id.* ¶¶ 4, 7. At the core of this action are Mandelay's allegations that QX World and White Dove sell devices and services that infringe on the Trademarks. *Id.* ¶¶ 2–3.[2]

In February 2003, Maitreya, predecessor to Mandelay, began using the SCIO Trademark. *Id.* ¶ 6. In January 2013, Mandelay began using the EDUCTOR Trademark. *Id.* Both the SCIO and EDUCTOR trademarks have been in continual use since those dates, and at least in part, in the United States. *Id* ¶¶ 62, 67.[3]

In 2010 or 2011, Maitreya experienced financial difficulties, which caused its CEO, Dubounet, to sell her majority share of Maitreya to Zoltan Nagy. *Id.* ¶ 7. Nagy assigned the rights of Maitreya's biofeedback production and sales, including the SCIO trademark, to Mandelay. *Id.* ¶¶ 8, 23. For two years after Dubounet's sale, she continued to be the sole supplier of SCIO and EDUCTOR biofeedback devices and related products through Mandelay's

---

[2] Although parts of the complaint suggest that Defendants are still engaged in the sale of allegedly infringing devices, Mandelay also alleges that Defendants have abandoned use of some of the Trademarks, as evidenced by the discontinuance of the EDUCTOR and SCIO sales on the QX World's website. Doc. 1 ¶ 53.

[3] In the parts of the complaint where Mandelay alleges that it engaged in sales in the United States, Mandelay does not provide the exact dates that sales began for each Trademark. *See e.g. id.* ¶ 62 ("Plaintiff's products and services provided under the Trademarks have been rendered in great numbers and continue to be extensively furnished and performed by Plaintiff throughout the United States"); ¶ 67 ("Plaintiff, prior to the acts complained of herein, has been and is now engaged in interstate commerce and/or the foreign commerce of the United States by virtue of the ongoing provision of goods and services under the Trademarks.").

The closest Mandelay gets to alleging sales in the United States starting at a specific date occurs in its allegations for the unfair competition claim under the Lanham Act, where Mandelay alleges that it has used the Trademarks "in interstate commerce . . . since 2003." *Id.* ¶ 46. Defendants argue that this allegation is inconsistent with earlier allegations that at least some of the Trademarks were first used in 2013. *See id.* ¶ 6

website at QXsubspace.com. *Id.* ¶ 9.

On May 14, 2012, three former Maitreya employees started QX World, and QX World worked for Mandelay to sell Mandelay's SCIO products. *Id.* ¶ 10. Mandelay alleges that in 2013 or 2014, QX World and Dubounet took control of Mandelay's sales website, QXsubsace.com, and Mandelay's software for operating the biofeedback devices. *Id.* ¶ 11.[4] During this time, Mandelay was unable to fulfill customer orders or provide software for customers purchasing the biofeedback devices. *Id.* ¶ 13.

In December 2014, QX World and Dubounet allegedly "coerced" Mandelay into signing an agreement that required Mandelay to provide payment to Defendants in exchange for allowing Mandelay's customers to download Mandelay's software from the QXsubsace.com website. *Id.* ¶¶ 14, 17. Mandelay contests the validity and enforceability of the contract but also notes that the contract itself includes an acknowledgement that the SCIO and EDUCTOR trademarks are the property of Mandelay. *Id.* ¶ 17–18; *See* Doc. 1-8.

In the years since, QX World filed numerous trademark applications in Europe attempting to assert rights over the Trademarks. Doc. 1 ¶ 15. Mandelay alleges that it has prevailed in "numerous" of these contested actions. *Id.*

On October 13, 2017, QX World filed a trademark application with the United States Patent and Trademark Office ("USPTO") for the SCIO trademark. *Id.* ¶ 19. Mandelay alleges this was a fraudulent application, given Mandelay was the owner of the SCIO trademark. *Id*. Mandelay alleges that it also filed an application for the SCIO trademark on that same day, but the application was inadvertently abandoned due to miscommunications with counsel. *Id.* at 9

[4] Dubounet and QX World were allegedly able to take control of the website because the website credentials had not been updated since Dubounet was CEO of Maitreya. *Id.* ¶ 12.

n.1.

Mandelay further alleges that QX World and Dubounet engaged in fraudulent behavior in the trademark proceedings by: (1) asserting that Dubounet herself owned several of the Trademarks and only granted Maitreya an oral license to use the Trademarks while she was majority owner;[5] (2) affirming that to the best of QX World's knowledge, no other person or entity has rights to the Trademarks; and (3) proffering a forged agreement dated March 31, 2017, allegedly signed by QX World, Dubounet, and Mandelay, which recognizes that Dubounet is the owner of one or more of the Trademarks. *Id.* ¶¶ 22, 24, 33; Doc. 1-9.

Mandelay alleges that QX World filed a series of additional fraudulent trademark applications with the USPTO, including for the EDUCTOR and several other allegedly infringing trademarks. *Id.* ¶¶ 39–40.

**B. Procedural Background**

Mandelay filed the instant complaint on February 17, 2025, asserting claims for unfair competition for other infringing designations, infringement of common-law trademark rights, unfair competition under the Lanham Act, unfair competition under New York common law, and prima facie tort. *See* Doc. 1 ¶¶ 54–79.

At a conference on September 25, 2025, the Court granted Defendants leave to file a motion to dismiss Mandelay's claims, which was fully briefed on December 4, 2025. *See* Docs. 72, 87, 95-1. In their motion to dismiss, Defendants argue that Mandelay's delay in bringing the instant action justifies dismissal for laches; that Mandelay fails to plausibly allege that it had

[5] Mandelay further alleges that Dubounet's assertions of an oral contract are untrustworthy because the Food and Drug Administration ("FDA") has recommended criminal prosecution of Dubounet due to fraud, Dubounet fled to Hungary to avoid such U.S. prosecutions, Dubounet is the subject of a Hungarian arrest warrant for forgery, Dubounet has been subject to three separate injunctions to stop her from practicing medicine, and Dubounet still described herself as a medical doctor. *Id.* ¶¶ 27–30, 38.

rights in the alleged trademarks or that Defendants improperly used those trademarks; with respect to its common-law trademark claim, that Mandelay fails to give Defendants notice of which state laws are applicable; and that Mandelay fails to state a prima facie tort claim. *See* Doc. 72-1.

## II. LEGAL STANDARD

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *See Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, the Court is not required to credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007)).

To survive a 12(b)(6) motion to dismiss, a complaint must allege sufficient factual matter to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). To do so, a plaintiff must allege facts sufficient to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 570 (indicating that if a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, the complaint must be dismissed"). "A plaintiff who has failed adequately to state a claim is not entitled to discovery." *Main St. Legal Services, Inc. v. National Security Council*, 811 F.3d 542, 567 (2d Cir. 2016) (citing *Iqbal*, 556 U.S. at 686).

## III. DISCUSSION

### A. Laches

Defendants first argue that the complaint should be dismissed due to laches because Mandelay waited over a decade between first learning of Defendants' allegedly unlawful use of the Trademarks and the filing of this case. Doc. 72-1 at 9–13. Mandelay argues that dismissal due to laches is inappropriate because Defendants clearly understood the Trademark rights were contested as the parties have been litigating in numerous jurisdictions around the world for the last decade and because Defendants have unclean hands as they adopted the Trademarks in bad faith in an effort force Mandelay to sign the 2014 agreement, and because they fraudulently filed applications with the USPTO. *See* Doc. 87 at 5–6, 8–10.

Laches is an equitable defense that "bars a plaintiff's equitable claim where he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997) (internal quotation marks and citation omitted). To prevail on a laches defense, a defendant must show: (1) that plaintiff had knowledge of defendant's use of its marks, (2) that plaintiff inexcusably delayed in taking action with respect thereto, and (3) that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time. *Vaad L'Hofotaz Sichos, Inc. v. Kehot Publication Society, a division of Merkos L'lnyonei Chinuch, Inc.*, 697 F. App'x 63, 64 (2d Cir. 2017) (internal quotation marks and citations omitted).

"In general, the defense of laches is not raised in a motion to dismiss." *Fitzpatrick v. SonyBMG Music Entertainment, Inc.*, 2007 WL 2398801, at *3 (S.D.N.Y Aug. 15, 2007). But "in certain circumstances, when the defense of laches is clear on the face of the complaint, and where it is clear that the plaintiff can prove no set of facts to avoid the insuperable bar, a court

may consider the defense on a motion to dismiss." *Id.* (quoting *Lennon v. Seaman*, 63 F. Supp. 2d 428, 439 (S.D.N.Y. 1999), *aff'd mem.*, 48 F. App'x 15 (2d Cir. 2002)).

"Even at the motion to dismiss stage, caselaw makes it clear that if the plaintiff fails to bring suit within the [applicable] statute of limitations, a presumption of laches will apply, and the burden will be on the complainant to aver and prove the circumstances making it inequitable to apply laches to his case." *Satan Wears Suspenders, Inc. v. Jaar*, No. 21 CIV. 812 (ER), 2022 WL 2181449, at *6 (S.D.N.Y. June 16, 2022) (internal citations and quotations omitted).

"To prevail on a defense of laches, however, a defendant 'must come with clean hands,' or in other words must have acted in good faith." *Mirrorlite Mirror, Inc. v. Glassless Mirror Manufacturers Inc.*, No. 23-CV-3437 (LAK), 2026 WL 1802597, at *5 (S.D.N.Y. June 23, 2026) (citing *Hermès International v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000)). In the trademark context, good faith "looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991) (internal citations omitted). "A laches defense, therefore, will not succeed 'when the defendant intended the infringement,' because a defendant's intentional infringement is 'a dispositive, threshold inquiry that bars further consideration of the laches defense, not a mere factor to be weighed in balancing the equities.'" *Mirrorlite Mirror*, 2026 WL 1802597, at *5 (citing *Hermès*, 219 F.3d at 107).

In its complaint, Mandelay has sufficiently alleged that Defendants engaged in intentional infringement such that the equitable doctrine of laches is unavailable at this juncture. Although Mandelay does not provide a lot of detail, it does allege that QX World was started by several ex-Mandelay employees, that QX World took control of Mandelay's sales website and software in

2013 or 2014, that QX World subsequently "coerced" Mandelay into signing a sales agreement, and generally that QX World has since been infringing upon the Trademarks in its sales. Doc. 1 ¶¶ 2–3, 10, 11, 13–14, 17. Taking these allegations as true, Mandelay has adequately pleaded that Defendants engaged in knowing infringement of the Trademarks, making laches unavailable at this stage.[6]

**B. Trademark Rights**

Next, Defendants argue that Mandelay fails to plausibly allege that it has enforceable rights in the Trademarks or that Defendants improperly used them. *See* Doc. 72-1 at 13–22. Specifically, Defendants argue that Mandelay does not allege that it is the owner of registered trademarks in the United States, and that Mandelay fails to allege common-law rights of ownership because it does not allege sufficient facts to demonstrate first use of the Trademarks in the United States or that the Trademarks are sufficiently distinctive such that they are protectable. *Id.* Defendants argue that this is fatal to all five of Mandelay's claims, as each is premised on Mandelay having enforceable domestic rights in the Trademarks. *Id.*

Meanwhile, Mandelay argues that the complaint sufficiently alleges worldwide use of the Trademarks and that Defendants' arguments about distinctiveness are misplaced. Doc. 87 at 11–13. Mandelay argues that any remaining dispute is a question of fact inappropriate for a motion to dismiss. *Id.*

In the instant action, Mandelay alleges no facts to support finding that it has registered the Trademarks with the USPTO. While Mandelay alleges that it filed a trademark application for the SCIO mark, it also alleges that it inadvertently abandoned the application due to

---

[6] Though Mandelay's allegations of bad faith center on QX World and not White Dove, Defendants make no argument that White Dove should benefit from laches if QX World does not.

miscommunications with its counsel. Doc. 1. at 9 n.1. Therefore, Mandelay must allege facts sufficient to support finding enforceable rights of its unregistered marks.

Generally, under the Lanham Act, a party "will prevail on the merits of its unregistered trademark infringement claim if it can show that it has a valid trademark entitled to protection and that the defendant's use of it is likely to cause confusion." *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997) (internal citations omitted). "Preliminary to making this showing, however, a plaintiff must demonstrate its own right to use the mark or dress in question." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 154 (2d Cir. 2007). "A party owns the mark in question if it made the first use of the mark to identify his goods or service and continues to use the mark commercially." *Now-Casting Economics, Ltd. v. Economics Alchemy LLC*, 628 F. Supp. 3d 501, 516 (S.D.N.Y. 2022), *aff'd* (2d Cir. 2024) (internal quotations and citations omitted). To establish first use, "that use in commerce must be in the United States. Commercial 'use of a mark overseas cannot form the basis for a holding of priority trademark use' in the United States." *Haggar International Corp. v. United Co. for Food Industry Corp.*, 906 F. Supp. 2d 96, 109 (E.D.N.Y. 2012).

Further, the "mark must be sufficiently 'distinctive' to distinguish the registrant's goods from those of others." *Star Industries, Inc. v. Bacardi & Co.*, 412 F.3d 373, 381 (2d Cir. 2005). "Such distinctiveness may be demonstrated in either of two ways. The mark may be 'inherently distinctive' if its intrinsic nature serves to identify its particular source." *Id*; *see also Thurber v. Finn Academy*, No. 6:20-CV-06152 (EAW), 2021 WL 927627, at *8 (W.D.N.Y. Mar. 11, 2021) ("An unregistered trademark is distinctive if it 'identifies the source of the product rather than the product itself,' and '[f]actors that show such a distinctive mark . . . include advertising expenditures, consumer studies that link the name to a source, sales success, unsolicited media

coverage, attempts to plagiarize the mark and the length of exclusive use of the mark.'" (internal citations omitted)) "Alternatively, even if not inherently distinctive, the mark may be distinctive by virtue of having acquired a 'secondary meaning' in the minds of consumers." *Star Industries*, 412 F.3d at 381.

The standards for trademark infringement and unfair competition claims under New York common law are "'virtually identical' to the standards for trademark infringement and unfair competition under the Lanham Act, except that New York common law claims 'require an additional showing of bad faith.'" *Lopez v. BigCommerce, Inc.*, No. 16-CV-8970 (JPO), 2017 WL 3278932, at *4 (S.D.N.Y. Aug. 1, 2017).

First, Defendants argue that Mandelay has failed to show when it began use of the unregistered marks in the United States, and therefore it fails to show that it was the first continuous user of those marks. Mandelay does at various points allege that it began use of the Trademarks in either 2003 or 2013, but it does not specify where those sales occurred. *See e.g.* Doc. 1. ¶¶ 1, 6, 9. Further at other points, Mandelay does allege that it engaged in sales in the United States, though never the exact dates that sales began for each Trademark. *See e.g. id.* ¶¶ 62, 67. However, viewing the facts in the light most favorable to Mandelay, the Court finds that these allegations support an inference that Mandelay used the Trademarks within the United States prior to Defendants' alleged infringement of the Trademarks in 2014.[7]

However, even if Mandelay has sufficiently established that they had first and continual

---

[7] Defendants also argue that Mandelay's allegations of continual use of the Trademarks are undercut by its own admissions in a September 16, 2025 pre-motion conference letter to the Court, in which Mandelay stated that it "has not made sales of new products [using the SCIO or EDUCTOR trademarks] in the past three years." *See* Doc. 72-1 at 21 (citing Doc. 51 at 2). While this does seem to contradict the allegations in the complaint, Defendants do not identify any caselaw suggesting that at the motion to dismiss stage, the Court should take notice of this letter as an admission.

use of the Trademarks in the United States, it alleges no facts to describe the distinctiveness of the Trademarks or otherwise support finding that the Trademarks are distinctive in a legally protectable fashion. Nowhere in the complaint does Mandelay describe the Trademarks or their distinctive qualities. Further, nowhere in its opposition does Mandelay argue that the Trademarks are inherently distinctive or that they have obtained a secondary meaning to make them distinctive.[8]

As Mandelay has failed to allege sufficient facts to demonstrate that it has trademark rights under the Lanham Act, it has similarly failed to state a claim with respect to New York common-law trademarks. *See Now-Casting Economics, Ltd.*, 628 F. Supp. 3d at 517 ("A party that fails to prevail on its Lanham Act claims thus cannot prevail on New York common law claims for infringement and unfair competition."). Further, all of Mandelay's claims against Defendants rest on either its Federal or state trademark rights. *See* Doc. 1. ¶¶ 54–60 (Count one, "infringing designations" based on Defendants' alleged misappropriations of the Trademarks); *id.* ¶¶ 61–65 (Count two, common law trademark infringement); *id.* ¶¶ 66–72 (Count three, unfair competition under the Lanham Act based on Defendants' alleged infringement of the Trademarks); *id.* ¶¶ 73–76 (Count four, unfair competition under New York common law for Defendants' alleged infringement of the Trademark); *id.* ¶¶ 77–79 (Count five, prima facie tort based on Defendants allegedly making sales infringing on the Trademarks). Therefore, all of

[8] In its opposition, Mandelay acknowledges that the Trademarks have not acquired a secondary meaning. *See* Doc. 87 at 13 ("To be concise, none of the asserted trademarks or other infringing designations have any meaning, thus need not acquire secondary meaning (apparently conceded by Defendants)"). However, Mandelay does not instead articulate why the Trademarks are inherently distinctive or otherwise distinctive such that they merit trademark protections.

Mandelay's claims must be dismissed.[9]

However, the Court dismisses these claims without prejudice. While Mandelay did not request leave to amend the complaint, and while the Court is not obligated to grant such leave absent a plaintiff's request, *see Dumontet v. UBS Finance Services, Inc.*, No. 21-CV-10361-GHW, 2024 WL 1348752, at *12 (S.D.N.Y. Mar. 29, 2024), the Court grants Mandelay leave to file an amended complaint by September 18, 2026.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED without prejudice. If Mandelay plans to file an amended complaint, it must do so by September 18, 2026, otherwise the case will be closed.

The Clerk of Court is also respectfully directed to terminate the motion, Doc. 72.

It is SO ORDERED.

Dated: August 28, 2026
New York, New York

EDGARDO RAMOS, U.S.D.J.

[9] Defendants additionally argue the documents attached to Mandelay's complaint show that it never had rights in the Trademarks to begin with. *See* Doc. 72-1 at 18–22. In doing so, Defendants assert that the translations in Docs. 1-1 and 1-2 are incomplete, and Defendants attach complete translations to their motion to dismiss. *See* Docs. 72-2, 72-3. They further argue that a recent decision in the Metropolitan Court of Budapest found that Mandelay is not the legal successor Maitreya and therefore has no property rights in the Trademarks. Doc. 72-1 at 20. Finally, they argue that the 2014 agreement and the 2017 agreements between the parties further acknowledges that Mandelay did not own the intellectual property at issue. *Id.* at 21. However, because the Court has already dismissed Mandelay's claims, it does not examine these arguments.